She refused to give Mr. Bourne the child's Social Security number. She changed his name on the birth certificate. She had a witness of hers took pictures of Mr. Bourne on only one occasion when he went to a bar for his 10-year graduation reception one time and they took photographs of him outside. She refused to give him daily schedules of the child. She told the doctor that he smoked in front of the child without even discussing it with him. She refused to change the child's name until the last minute. She set him up with pictures at trial. She submitted photographs of dirty clothes. She had told Mr. Bourne, go ahead and use my clothes. Give them to me dirty because I'm not working. You are. I'll wash them. And she took pictures of them. Mr. Bourne couldn't even learn whether the child had been baptized or not. She changed. She wrote to the insurance company and told them. Somebody wrote to the insurance company. Mr. Bourne didn't and told them to send all insurance information to her address in Mackinac. These are all clear signs, Your Honor, that Ms. Brooke Arnold was not willing to facilitate a relationship. And yes, the trial court did criticize Mr. Bourne for two different issues. Mr. Bourne took the child to a program known as SPICE. It's a state program because an expert had told Mr. Bourne, a woman who worked several years in the area of child development including Montessori School, that the child seemed to be not progressing or not as developed as some child should be at her age. So Mr. Bourne did take or had the SPICE people come to his house when he had visitation. The SPICE people provided a written summary, which is in our appendix, and noted that the child was behind. Behind in locomotive, behind in a number of areas. 40% in one area and 30% in a few other areas. He did not tell Ms. Arnold that he was having this evaluation. He explained he didn't because he was afraid, one, she wouldn't allow it. But even when he did try to talk to her about it afterwards, she refused to allow him. The recommendation of that program was further follow-up for this child. And she refused that. And, Your Honors, I would submit, is that in the child's best interest, for a mother to refuse further evaluation of a child who experts, independent experts, had found she was developmentally not progressing as quickly as a child of her age. There were additional experts to testify along the same line at trial, and now one of the experts has been characterized as Mr. Bourne's paramount. There was no evidence that Sarah Miles was the expert. Sarah Miles testified to not only working in daycare, but she was the director of Montessori. She had done evaluations of children, and there was no evidence that Chris, Mr. Bourne, did anything but call her to give him advice and guidance if she had seen any concerns about the child. I think that should have caused some great concern and certainly demonstrates that Ms. Arnold was not acting in the best interest of Brooke in that matter. The only reason Ms. Arnold had primary custody for 21 months was because of the incident where the incident between his grandmother and her, she takes the child, they've been living together for five months, and on that day, Ms. Arnold takes the child from his home, moves in, keeps her for 17 days without talking to Chris at all, and then moves in with her parents. The only, any other case, I can see that courts should look to who has been the primary custodian, but this child was only 21 months old. The primary custodian was not determined by agreement or by court order, and the only reason it remained was because of Brooke's actions, and I think the court, in just looking to who was the primary custodian, and in not considering the concerns about the willingness or ability to facilitate, as well as the physical altercation, I think its decision was against the manifest way of the evidence. With regard to... You know, counsel, in just looking at the cold record, it kind of jumps out, at least at me, that this was probably a pretty close case. In the mind of the trial court, so you're asking us to say, assuming my colleagues agree with me, that trial court's decision was manifestly erroneous, erroneous meaning that the opposite conclusion was clearly apparent. That's a tough burden here, isn't it? And I understand it is a tough burden, Your Honor, but when you look to the numerous ways that Ms. Arnold was not facilitating a relationship between Mr. Bourne, when you're looking to which parent is going to raise this child for the next 16 and a half years to be an honest person, to be credible, to be cooperative, to be respectful, and I believe the great weight of the evidence in the record demonstrates the contrary. And when you look to stability and continuity, Ms. Arnold is living with her parents. She's attending school. We don't know for what. We don't know for how long, other than she indicated several years she's attending school. What stability is that? She had been fired from no fewer than three jobs. After her maternity leave, she was fired from her job. She took another job, and she quit that job. Now, at the time of the hearing, she was staying home. That had never been the party's plan. When the parties were together, the two of them were going to be working. In fact, again, she returned to work after the maternity leave. So did your client take the CPR classes that were necessary for the care of the child when he had the first opportunity to do so? Well, Your Honor, no, he didn't, because he was the one that was supporting the family at that time. He was paying all the bills, working six, seven days a week, nine, ten hours a day. So no, he hadn't. But he had taken it thereafter. Again, he was burdened with all of the financial obligations, paying all of their bills. He paid her bills. He paid for the child. He paid for her bankruptcy that she declared. When you look to her stability, again, she's been fired from three jobs, quit jobs. The school she's attending, she had been placed on suspension on before. We don't know how long she's going to live with her parents. Whereas Mr. Born has a home, which is plenty large to raise the child. He bought that home in an area knowing the school district and the school district would be appropriate. He's been employed consistently. He was employed consistently for several years at one place of employment. He's got a college degree. He's never declared bankruptcy. But when you look to stability, I believe the great way the evidence demonstrates that Mr. Born was certainly the more stable one. When you look to which party was looking out for the best interest of the child, I mean, again, when you have an expert that says this child is behind, you need to do something and you don't do anything, I think that should have caused great concern for the trial court. When Mr. Born requests that or suggests to Ms. Arnold that they find a physician, and the trial court indicated in its opinion that Mr. Born wanted to do that just so it was closer to his home. But as Mr. Born had explained in his testimony, right now the physician is, the pediatrician is 45 minutes away from Ms. Arnold's home in the other direction from Bloomington. She lives in Mackinac, the doctor is in Peoria. So when the child is in Chris's care, he's got almost an hour to get to Peoria. He was just suggesting so that the pediatrician is available when both parties need that pediatrician, why not have someone in between Mackinac and Bloomington, and that's another factor. Best interest of Addison would be to have a physician closer to both parties in the event that Addison needed care. Your Honors, I believe the evidence demonstrates that the court's ruling was against the manifest way of the evidence. Thank you. Thank you, Counsel. You'll have rebuttal. Please. May it please the Court. I'm Jason Netsley, and I represent the aptly Brooke Arnold. For the purposes of today, I'll try to refer to either parties as Brooke and Chris. Here we have the custody judgment where the trial court had two full days to listen to testimony, examine piles of exhibits, and determine all the credibility of the witnesses actually sitting there and listening to them. The parties even had the benefit of having formal discovery prior to trial. With respect to this case, I'd like to talk just a little bit about the law before we get into the facts. In terms of the decision itself, we just heard quite a bit about the attorney's version of the facts, and I'd like to refer the Court to our own statement of facts that we submitted. I believe that fully fleshes out both sides of the story. When the Court explores those facts, I think that the Court would see that there was substantial evidence for the foundation of the trial court's ruling of custody in Brooke's paper. The standard of review of use of discretion against the manifest way, the Court's seen this countless times. I've submitted my authority in our brief. The Court gives great deference to the trial court's ruling. All inferences should be given in favor of the trial court's decision making. The trial judge is sitting there, is able to listen to all the witnesses, and that's what Judge Butler did. When you read the respective briefs, and if the Court reviews the lower court's opinion, one would see that, as one could expect, the witnesses that Chris presented to testify testified favorably for him, that he was a good parent, and they highlighted the perceived shortcomings of the other party. The same with Brooke Arnold. Her witnesses said she's a great mom, and they highlighted the shortcomings of Chris. Credibility does come into play here. It does. And the trial court was able to sit down, listen to all these witnesses over two days' time, and that great deference is what... How many witnesses testified? Well, Your Honor, the proceedings started with... An approximate number. Ten. And this was two full days of testimony? It was, Your Honor. Rather than closing arguments, Judge Butler had us do written closing arguments, so that wasn't included in the oral. The appellant's closing was 27 pages, and the appellee's was four pages. This is a summary of the testimony the Court recorded. Your client is going to some college at this time? She is, Your Honor. And when she's not at home with the child, who takes care of the child? When she's not at home with the child, as the trial court heard, it's family that takes care of the child. Generally speaking, her mother, Kathy Arnold, who she and the child have lived with by and large since Addison was released from her premature birth from the hospital. They went and they moved in to a two-and-a-half-acre lot adjacent to the lake in Mackinac with Brooke Arnold's parents, Kathy and Greg Arnold. And there was that three-month period of time when Brooke Arnold and Addison then resided with Chris Bourne in Bloomington, wherein Brooke was the primary caretaker. The trial court heard the evidence that Brooke wouldn't let Chris help take care of Addison. And I suspect the trial court was able to listen to Chris's credibility when he said that, because we all know that mothers want to be the sole person who takes care of changing a child's dirty diapers. And now that Brooke moved back into her mother's home, she has her mother there who works at State Farm, but whose work schedule is juggled so that when Brooke's at school, she can help care for the child. Mr. Bourne testified at the hearing? Your Honor, Mr. Bourne did testify at our two-day testimony. If he were awarded custody, who would be taking care of the child when he was working? Your Honor, Mr. Bourne testified that if he were awarded custody, a daycare or babysitter would take care of Addison on Mondays, Tuesdays, Wednesdays, Fridays, and Saturdays, five days a week. And from his prior history of interaction with Addison, we know that Mr. Bourne had the babysitter take care of Addison on Thursday, his day off. We'd be looking at an instance where the mom, who's able to take care of the child, isn't taking care of the child, and Mr. Bourne might see his child on Sundays, basically. Did Mr. Bourne admit that, that he did have a daycare provider or a babysitter in the house on Thursdays on his day off? When he testified, or did he or not? Your Honor, that was in reference to Mr. Bourne did acknowledge that Jody Richards was present at the home. There would be disputing testimony as to the length of time Jody Richards, the babysitter, was at Mr. Bourne's home during that three-month period of time when Mrs. Arnold, when Brooke Arnold resided with Mr. Bourne in Bloomington. Jody Richards, the babysitter, testified, I believe, that she spent a substantial portion of the day, 8.30 to 9 a.m. to 3 to 4, 4.30 in the afternoon, caring for Addison and that Mr. Bourne did not care for Addison during that time. I believe that the record would reflect that Mr. Bourne would testify that Jody Richards, the babysitter, was there, but that she wasn't there for the entirety of that time. He took over more responsibilities. However, he also indicated that Brooke would not let him take care of Addison when he was at home and that she was the primary caretaker. So we are looking at a situation where Brooke Arnold was the primary caretaker, has been Addison's primary caretaker since she was born, May 12, 2009. This coming Sunday, Addison will be two years and one month old. Brooke Arnold has been Addison's primary caretaker since day one. There was that three-month period of time when Brooke and Addison did reside with Chris Bourne and he admitted that she was the primary caretaker during that time. This isn't a case where the court's looking at the facts and observing that the minor child was living with one parent while they were separated and the other parent wasn't there. No, for this whole spectrum of time, Brooke has been the primary caretaker. And frankly, what the trial court was looking at after the court heard all of this evidence, the decision to be made was, well, will the trial court be giving the child to the parent who has said on the record that he would rather have a non-parent, a babysitter or daycare provider, take care of Addison rather than have Brooke take care of her, or is the trial court going to have the mother take care of Addison? There wasn't undue emphasis given to the court's consideration of the primary caretaker's stability. These are just factors that any court would consider when determining custody allocations. Is the court going to grant a minor child to the parent who works so much that he's just not going to be able to be the one that takes care of the child? A great deal was made about the allegations of the court ignoring Brooke Arnold's violent tendencies. This wasn't a case about Brooke Arnold's violent tendencies. And the question would be, did the trial court fail to take something into consideration? That is, that abuse of discretion. And what the trial court noted in its opinion was that both parties testified to acts of physical violence committed by the other and that they each denied the other's accusation. The court specifically found that neither party committed ongoing abuse against the other and the events to which the parties testified to do not significantly reflect on either party's ability to parent. Counsel, I want to point out that, as I'm sure you know, Supreme Court rules do not require an appellee to prepare a statement of facts. You instead can rely upon the statement of facts presented by the appellant. However, if you do provide a statement of facts, you are required to comply with the same rules that I just quoted, 341.86. They're supposed to be non-argumentative and they're supposed to be factual and they're supposed to be set forth appropriately. You failed to meet that criteria, meet those criteria in your case. The only thing I can point out is your violation was less egregious than the appellant's, but that's not something that should go without observation, Counsel. If you do this in the future, you will be expected to comply with Supreme Court rules as well. Yes, Justice. Assuming that everything that Chris Bourne said was true, that Brooke Arnold slapped his grandmother back after his grandmother slapped Brooke, let's just assume that that's actually what happened. Is the court placing custody with Brooke Arnold just so egregious that it's against the manifest weight of the evidence? I mean, is that enough for the appellate court to say, hey, this is a crazy decision, and the case law says no? I mean, if we look back to Stewart, in the marriage of Stewart, we have a case where we had custody placed with the mother, and this mother had some issues. We know that she got into her car, she drove it into the truck that the father was driving. Okay, there's strike one. And it was an abuse of discretion to place custody with the mother. What else did she do? Well, she was holding one of the children. She picked up a knife and she threatened the father. There's strike two. Well, it's a good thing this isn't baseball because there weren't three strikes in the trial court. The appellate court said, hey, this is not an abuse of discretion. In this instance, we're even looking at, assuming the allegations were to be true, a mere contact of provoking or insulting nature to slap. Well, is that egregious? We look at cases such as in-rate custody of Williams where the court has said, well, if a party has to have surgery, they're hospitalized, these are serious enough things that we'll consider granting custody to the victim of that violence. In this case, the case of Vargas doesn't rise to that threshold. There were a few tag-along arguments on top of the allegation of violence, but before we move on to those, we'd have to point out this wasn't just a case where the finger was pointed at Brooke Arnold, that she had committed violence. As the court pointed out, there were allegations of violence between both. Brooke testified that she and Chris had arguments and Chris was upset because she refused to have an abortion. She refused to abort Addison.  Do you agree that that was the case? That was the case, Your Honor. Mr. Bourne admitted that and prepared an abortion checklist, pros and cons and so forth. Was that still available as an exhibit? Was it introduced as an exhibit? It was introduced. I believe it was introduced as an exhibit in the record, Your Honor. If not, it was testified to and that testimony is in the record. And when I asked Chris about that checklist, he did note that on his list he wrote down pros. Brooke is a good parent. She's a good person. Well, there were these arguments. Brooke testified that Chris shook her and within a couple of days of that shaking, she had spotting and clotting and she was rushed to the emergency room and she was put on bed rest. Now, these are in the months preceding Addison's birth on May 12, 2009. Addison is born. She's a trooper. She's healthy. She's alive, but she's got to be attached to this heart and lung monitor. And the trial court was aware of all of these issues and what Brooke had to go through. Mr. Bourne did not prioritize Addison's health. He didn't prioritize obtaining the heart and lung monitor certification. He didn't prioritize obtaining the emergency CPR certification. In fact, he didn't choose to prioritize those things until after the parties, after Brooke Arnold moved out on November 3, 2009. And, in fact, the trial court was mightily aware that all of the maneuvering by the parties was going on in the context that there had been litigation on this since the day after the altercation between Chris's grandmother and Brooke. Brooke had petitions filed by Chris on November 3, 2009. There's been argument that Brooke refuses to cooperate with Chris and wouldn't facilitate a close and continuing relationship between Chris and the child. Well, the evidence that the court heard was just the opposite of that. Brooke testified that Chris just wasn't listening to what she was saying with regard to Addison. She was trying to communicate and have this dialogue back and forth, and it just wasn't sinking in. And she had to rely upon this extraordinary measure of writing 45 pages of handwritten notes. Forty-five. What medication Addison had taken, how Addison had acted during the day, nap times, eating, all of these things that she felt Chris wasn't properly listening to. She bent over backwards to keep Chris in the loop and on board as a parent. In fact, she testified that she was willing to attempt to try a joint parenting as long as she had the primary residential status. She felt as though the court order might give the parties guidance that would give Chris the opportunity and some structure to interact with her. She even juggled visitation. Chris argued that Brooke wasn't cooperative with visitation. Well, on cross-examination, these incidents of not allowing Addison to visit with Chris were narrowed down to a handful of incidents. And they start with Brooke being newly released from the hospital with Addison. She's not released to drive. That's how it proceeded. And Chris says, come over ten minutes down the road to my sister's house. Brooke had asked for Chris and the family to visit Addison and her mother's home. The court heard all of this evidence with testimony from each side. And what it boils down to on each of those elements is there's just not that large element that the court would look at to say, you know, this was just an abuse of discretion. The appellant has argued that Chris is a better role model than Brooke. Well, the courts have found that, you know, even if it is possible that a father would be a better role model than the mother, that doesn't mean that he should necessarily have custody. The Nolte and Lane cases talk about the mother retaining custody while the noncustodial parent being able to be there, is still able to be there as a good role model for the parent. There's been discussion about Brooke's prior employment way back to before Addison was born. Well, 602B says that the court shall not consider conduct of a guardian or current or proposed guardian that doesn't affect the relationship of that person with the child. The Ridday case says that behavior prior to birth should not be considered. All these, all this ancient history that's being dredged up was, the court was informed of it and the court properly gave it what little weight it was deserving. Finally, the last tag-along argument after the violence argument  I believe that refers, thank you, I see you, my time is up. Actually, you have another minute or two until the red comes on, but it's up to you. Well, I'd be remiss in my duties if I didn't address that point. Okay, when the red comes on then you will be finished, thank you. The experts that are referred to would be Chris Warren's college friend, Sarah Miles. Sarah testified that she was reconnecting with Chris and she has been with Chris and Addison at Chris' home for at least 50 times. Now, she hasn't observed Addison interact with Chris and she is obviously a friend, testifying favorably for her friend Chris. The other expert is what the court and Brooks Counsel at the lower court refer to as the daycare provider, Celia LaChanze. And this daycare provider, Chris' pain, has seen the child 12 times and has not seen the child interact with Chris. As a matter of fact, what's interesting, if one looks at Sarah Miles being with Addison and Chris at least 50 times and the daycare provider being with Chris 12 times, Chris has only seen Addison on Tuesdays and Sundays, essentially, since Brooke moved out on November 3rd, 2009. There are fewer days that Chris has been the sole caretaker of Addison than not. What's happening here? Sarah Miles is coming over, she's helping Chris care for Addison. The court was able to consider the testimony of these persons, the testimony of Seal. Seal said that Chris didn't smell like smoke, Addison never smelled like smoke. Well, Chris himself testified that he hadn't attempted to quit smoking and I see my time is actually up here on this. Thank you, Counsel. Ms. McGrath for rebuttal, please. Thank you, Your Honors. May it please the Court, I certainly recognize that current facts don't control. However, counsel was asked what happens to the child when Ms. Arnold is in school and counsel didn't advise the Court that in fact now Ms. Arnold is working 37 hours a week and she is in daycare. With regard to the concern about Mr. Bourne not having training on this heart and lung monitor, and I'm not meaning to misrepresent the record, I do not believe there was testimony about that. There may be an exhibit that demonstrates that she was on that heart and lung monitor for 24 hours before she was released from the hospital. With regard to the suggestion that this Seal is a daycare provider, she was qualified by the Court as an expert. She had 45 years of experience, not only daycare experience, but evaluating children who have speech issues and she provided testimony that from her experience and observations with Addison, she did have concerns about Addison having speech issues, which goes back to the spice evaluation that Ms. Arnold totally disregarded. Seal, the chance, also testified she did observe, and you will find that in her testimony, she observed Mr. Bourne with Addison and they always had a loving, he has a caring, responsible interaction with the child. There were numerous witnesses that testified that Mr. Bourne took care of the child on his own whenever he had an opportunity to have visitation with the child. His mother testified, a neighbor testified, other witnesses testified that he took care of the child when Addison is in his care. With regard to, yes, Mr. Bourne did file a petition for custody the day after the incident took place with the grandmother. He did that on his own. He didn't even do that with an attorney. And that he did that demonstrates the concern he had about Addison and Ms. Arnold's behaviors. Yes, he did present an abortion checklist, your honors. Counsel fails to tell the court, and this is in the record too, Ms. Arnold conceded on cross-examination that she too had prepared pros and cons, a checklist based on them considering abortion. She didn't produce that, though, as an exhibit. She only produced his as an exhibit. I see my time is up, your honors. Actually, you've got until the red as well. You probably have about a minute left. That Ms. Arnold suggested joint parenting. That was a red herring. She didn't want joint parenting. From her behaviors and the evidence that was presented with the court, clearly she was non-cooperative, and the evidence presented to the court suggested that in the best interest of Addison, Mr. Arnold should have been awarded custody. Thank you, your honors. Thanks to both of you. The case is submitted. The court stands in re-